STATE v. TALLEY

[110 N.C. App. 180 (1993)]

_____

STATE OF NORTH CAROLINA v. FRANK TALLEY, JR.

No. 9226SC478

(Filed 18 May 1993)

1. **Criminal Law § 1686 (NCI4th) — trial de novo in superior court — more severe sentence**

    Defendant's rights were not violated by the imposition of a more severe sentence for cruelty to an animal upon trial *de novo* in superior court than the sentence imposed in the district court where there was no evidence in the record that the sentence was increased to penalize defendant for exercising his right to a jury trial.

**. STATE v. TALLEY**

[110 N.C. App. 180 (1993)]

**Am Jur 2d, Criminal Law § 314.**

**Propriety of increased punishment on new trial for same offense. 12 ALR3d 978.**

**2. Criminal Law § 1025 (NCI4th) — active sentence — no penalty for notice of appeal**

Defendant failed to show that the trial court improperly imposed an active sentence for cruelty to an animal because he gave notice of appeal where the trial court offered defendant alternative sentences of a one-year prison term with a $1,500 fine or a one-year prison term with defendant to be placed on supervised probation with certain conditions attached thereto for a period of three years except for ninety days during which defendant would be eligible for work release; defendant's counsel informed the trial court that defendant did not choose either sentence but instead wanted to serve notice of appeal; and the trial court announced that defendant had rejected probation, sentenced defendant to the active term, and entered notice of appeal on defendant's behalf.

**Am Jur 2d, Criminal Law §§ 525 et seq.**

**3. Evidence and Witnesses § 623 (NCI4th) — pretrial motion to suppress — necessity for writing and affidavit**

The trial court did not err in the denial of defendant's motion to suppress seized evidence on the ground that defendant failed to comply with the requirements of N.C.G.S. § 15A-977 where the motion to suppress was oral and was not accompanied by an affidavit containing facts supporting the motion.

**Am Jur 2d, Motions, Rules, and Orders § 9.**

**4. Criminal Law § 976 (NCI4th) — denial of motion for appropriate relief — motion and documents not in record — no appellate review**

The trial court's summary denial of defendant's motion for appropriate relief is not reviewable on appeal where the record on appeal does not include the motion for appropriate relief or any supporting documents that might have been filed with the motion. N.C.R. App. P. 9.

**Am Jur 2d, Appeal and Error § 498.**

5. **Animals, Livestock, or Poultry § 19 (NCI4th)— cruelty to animal—sufficient evidence of willfulness**

There was sufficient evidence that defendant acted willfully to support his conviction for cruelty to an animal in violation of N.C.G.S. § 14-360 where the evidence tended to show that a mare owned by defendant was 300 to 500 pounds underweight; it would have taken more than six months for the mare to become so emaciated; the owner of a pasture asked defendant several times to remove his horses from the pasture because there was no food in the pasture; each time defendant said he would move the horses but failed to do so; and the mare was euthanized because of its condition.

Am Jur 2d, Animals §§ 28, 29.

What constitutes offense of cruelty to animals. 6 ALR5th 733.

6. **Evidence and Witnesses § 1229 (NCI4th)— statements to animal control officer and veterinarian—admissibility**

Defendant's statements to an animal control officer and a veterinarian that he had heard if you kick a horse in the hip it will stand up, that he agreed a horse he owned needed to be euthanized, and that his horses had not been seen by a vet were not the result of an impermissible custodial interrogation and were properly admitted in defendant's trial for cruelty to an animal.

Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence §§ 523-529.

7. **Criminal Law § 375 (NCI4th)— remarks by trial judge— defendant not prejudiced**

Defendant was not prejudiced by the trial judge's statement to the jury that he was speaking loudly because he understood that defense counsel was hard of hearing or by the trial judge's statement, after the jury returned to the courtroom, that "we are waiting for Mr. Bell and his client, Mr. Talley. I do not know where they are."

Am Jur 2d, Trial §§ 276 et seq.

STATE v. TALLEY

[110 N.C. App. 180 (1993)]

8. **Criminal Law § 497 (NCI4th) — deliberations — jury request to review exhibit — failure to submit related exhibit**

Where the jury requested during deliberations to examine a specific defense exhibit, the trial court did not err by failing to submit a related exhibit to the jury for its examination. N.C.G.S. § 15A-1233.

**Am Jur 2d, Trial §§ 1665, 1666.**

9. **Criminal Law §§ 1075, 1083 (NCI4th) — misdemeanor — inapplicability of Fair Sentencing Act — findings of mitigating factors unnecessary**

The trial court did not err by failing to find certain mitigating factors in sentencing defendant for cruelty to an animal since this offense is a misdemeanor punishable by a maximum term of one year and is not within the scope of the Fair Sentencing Act. Furthermore, the record does not show that the trial court failed to consider such factors.

**Am Jur 2d, Criminal Law § 527.**

10. **Judges, Justices and Magistrates § 27 (NCI4th) — failure of judge to recuse himself — no error**

The trial judge did not err by failing, *sua sponte*, to disqualify himself in a prosecution for cruelty to an animal on the ground of bias against defendant.

**Am Jur 2d, Criminal Law § 827.**

**Due process clause of Fourteenth Amendment as requiring disqualification of state or local judge from participation in particular litigation — Supreme Court cases. 89 L. Ed. 2d 1066.**

Appeal by defendant from judgment entered 12 February 1992 by Judge Claude S. Sitton in Mecklenburg County Superior Court. Heard in the Court of Appeals 14 April 1993.

Defendant was convicted of cruelty to an animal under G.S. § 14-360 before the 24 May 1991 criminal session of Mecklenburg County District Court. Defendant appealed to the Mecklenburg County Superior Court where on trial *de novo* he was again convicted of cruelty to an animal. He was sentenced to one year in prison and fined $1,500.00.

The State's evidence tends to show that on 26 March 1991 Denise Lambiotte, a field team supervisor with the Charlotte Mecklenburg Animal Control Department, received a complaint concerning cruelty to animals. As a result of the complaint, Ms. Lambiotte contacted Mr. Woodrow Redfearn. Mr. Redfearn told Ms. Lambiotte that the defendant placed horses on his property in October 1990 and that he had requested the defendant to remove them several times. Mr. Redfearn testified that he made the requests because there was not any food in the pasture. He also testified that each time he told the defendant of the problem, the defendant said he would take care of it right away.

On 27 March 1991 Ms. Lambiotte and another Animal Control employee visited the property where the animals were allegedly kept. Ms. Lambiotte observed thirteen adult horses and two foals in a pasture. One of the horses, a chestnut mare, was severely emaciated, suffering from extreme hair loss and had what appeared to be an open draining abscess underneath her jaw. Ms. Lambiotte also observed other horses that were in poor health. Ms. Lambiotte returned to her office, consulted with her director, Diane Quisenberry, who instructed her to have a veterinarian, Dr. Barbara Nicks, return with her to the pasture. Ms. Lambiotte, Dr. Nicks and another Animal Control employee returned to the property that afternoon. After taking photographs and compiling a list of the horses and their conditions, Ms. Lambiotte filled out and left two Animal Control Department cruelty warning letters. The letters, which were left attached to the pasture fence, warned that the horses were not being cared for in violation of G.S. § 14-360, and allowed one day to correct the problem in order to avoid legal action. Ms. Lambiotte then returned to her office and dispatched an Animal Control officer to deliver the same letter to defendant's residence. That letter was left on defendant's front door. Because Mr. Redfearn could not remember the defendant's last name, the letters were addressed to Frank Talbert but were left at defendant's residence.

On 28 March 1991 Ms. Lambiotte returned to the pasture. She saw a small amount of hay scattered in the pasture, and noticed that one of the two letters she had left on the fence was gone. Ms. Lambiotte returned to her office where she received a phone call from the defendant. Ms. Lambiotte instructed the defendant to have a veterinarian at the pasture by 3:30 p.m. The defendant agreed, but said he would need until 4:30 p.m. to get his veterinarian, Dr. Gochnauer. Ms. Lambiotte then called Dr. Ennulat, an equine

veterinarian specialist, who agreed to accompany her to the pasture. When Ms. Lambiotte returned to the property the gate was open, the horses were gone and the defendant was not present. Ms. Lambiotte radioed her office and asked that another supervisor call Dr. Gochnauer to see if he had been contacted by the defendant. He had not. Ms. Lambiotte returned to her office, and was advised to contact a police attorney regarding an arrest warrant. On 29 March 1991 an arrest warrant was issued for the defendant.

On 1 April 1991 Ms. Lambiotte observed the horses in another pasture located approximately twenty to twenty-five miles from the first pasture. Ms. Lambiotte drove to a nearby gas station, called her director and instructed two animal control officers to come out to the property. Ms. Lambiotte obtained permission from the pasture owner's son, Mr. Gordon, to enter the property. Ms. Lambiotte then returned to her office, picked up a sworn law officer and went to the magistrate's office where she obtained a "search and seizure warrant." Before leaving the pasture, Ms. Lambiotte left another letter, similar to the previous letters, on the pasture's front gate.

After obtaining the search warrant, Ms. Lambiotte returned to the pasture where she talked with Antonio, an employee of the defendant who had arrived while she was gone. Ms. Lambiotte told Antonio to contact the defendant. Antonio left. The defendant arrived about 2:20 p.m. The defendant told Ms. Lambiotte that the chestnut mare with the abscess had cut her mouth on a fence, and that he had not taken her to see a vet. At 3:15 p.m. Dr. Ennulat arrived. Dr. Ennulat and Ms. Lambiotte, with the defendant's permission, entered the pasture with the defendant. Antonio brought each horse up to be examined. When the chestnut mare, Persian Flame, was offered feed she began heaving, coughed up feed and snorted feed out of her nose. Persian Flame had rain rot over eighty percent of her body and was between 300 and 500 pounds underweight. Ms. Lambiotte testified without objection that it would have taken more than six months for the mare to become so emaciated. The defendant told Ms. Lambiotte that Persian Flame had not been taken to be seen by a vet. Ms. Lambiotte told the defendant that she was going to take Persian Flame. Antonio helped her load Persian Flame onto the Animal Control horse trailer. Persian Flame was taken to the Animal Control shelter.

STATE v. TALLEY

[110 N.C. App. 180 (1993)]

The next morning Persian Flame was extensively examined. Among other things, it was determined that the abscess under her mouth was caused by a fractured tooth that had not been completely removed. The remainder of the fractured tooth was removed. According to Ms. Lambiotte, it would have taken at least a month to six weeks for the tooth to abscess.

At approximately 9:00 a.m. on 20 April 1991 Ms. Lambiotte was informed by a veterinarian technician that Persian Flame was down in her stall and in distress. Dr. Ennulat, who had also been called, arrived at about 10:15 a.m. and began trauma care. A short while later, the defendant showed up and inquired as to Persian Flame's condition. Dr. Ennulat told Ms. Lambiotte that the horse needed to be euthanized, and Ms. Lambiotte called her director who gave her permission to have the horse euthanized. When Ms. Lambiotte returned she saw Dr. Ennulat and the defendant talking. The defendant said, "I've heard if you kick them in the hip they'll get up." Dr. Ennulat asked the defendant if he agreed that Persian Flame needed to be euthanized. The defendant nodded his head and said, "Yes." Persian Flame was then euthanized, and Ms. Lambiotte arranged for a necropsy, the equivalent of an autopsy, to be performed.

The defendant called three witnesses to testify. Larry Martin testified that the defendant took care of his horses. The defendant then took the stand and testified that he received Persian Flame as a gift. At the time he acquired Persian Flame she was in very poor condition. The defendant testified that he obtained Persian Flame with the intent to "have her foaled." Defendant further testified that Persian Flame did have a foal, and that at that time defendant and Dr. Ennulat, the veterinarian who examined Persian Flame after she foaled, did not find anything wrong with her. In June 1990 the defendant shipped Persian Flame to Florida for the purpose of having her bred. The defendant had obtained the necessary health certificate required by Florida for all horses being transported into or out of state. The defendant also testified that he purchased food for his horses which was given to them.

On cross-examination the defendant testified that when he obtained Persian Flame she was "in decently good condition[,]" but was in a semi-emaciated state. The defendant also testified that Antonio brought him one of the notices that Ms. Lambiotte left

on the fence where the defendant's horses were first located. As a result the defendant called Ms. Lambiotte.

Finally, the defendant called Dr. Darnell Welfare, a veterinarian, to testify. Dr. Welfare testified that he suspected that Persian Flame was kicked in the mouth by another horse causing injury to her tooth, and that septicemia, a bacterial infection usually spread throughout the body by the blood stream, can result if a tooth is not completely removed. Dr. Welfare also testified that if a horse dies with colic, an accumulation of gas in the digestive tract, the colic could be caused by change in diet or the consistency of the diet. According to Dr. Welfare, Persian Flame underwent a change of diet.

From judgment on the verdict, defendant appeals.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Thomas B. Wood, for the State.*

*Michael F. Talley, Fletcher N. Smith, Jr., Charles V. Bell and Charlene Bell-Taylor for the defendant.*

EAGLES, Judge.

Defendant raises nine separate arguments on appeal. We find no error.

I

[1] Defendant first argues that the trial court impermissibly sentenced him to the maximum punishment allowable because the defendant gave notice of his intent to appeal and exercised his right to trial by jury. The District Court sentenced the defendant to one year imprisonment, suspended for three years, with a $500 fine. Upon trial *de novo* and conviction in Superior Court, the court fined defendant $1500 and sentenced him to one year imprisonment.

> A defendant's rights are not violated by the imposition of a more severe sentence by the superior court upon trial *de novo* from district court. The imposition of a longer sentence than was given in district court is not an unreasonable condition absent an indication the second sentence was increased to penalize a defendant for exercising his rights. The burden is on the defendant to overcome the presumption that a court

acted with proper motivation in imposing a more severe sentence.

*State v. Daughtry*, 61 N.C. App. 320, 324, 300 S.E.2d 719, 721, *disc. review denied and appeal dismissed*, 308 N.C. 388, 302 S.E.2d 253 (1983) (citations omitted).

[2]   During the sentencing hearing the trial judge in open court afforded the defendant the opportunity to choose between two different sentences. The first sentence offered would impose a one year prison term, suspended for three years except for ninety days during which the defendant was eligible for work release. It also would place defendant on supervised probation for a three year period which included *inter alia* the following special conditions: (1) that defendant reimburse $1,269.25 for the costs of treating Persian Flame; (2) that defendant provide 200 hours of service to the Charlotte Mecklenburg Animal Control Department; (3) that defendant read books etc. on the care and treatment of horses as assigned by his probation officer; and (4) that he write a fifteen page paper entitled Proper Care, Treatment and Appreciation of Horses. The second sentence offered would impose a one year prison term with a $1,500 fine. After setting out the alternative sentences, the trial judge asked the defendant which sentence he would prefer. The defendant did not respond. The trial judge then asked the defendant:

> I put you on probation under that condition, but if you want me to strike it out and just make it a year, *which is the Court's intention to do that,* I'll be happy to strike the probation part out and just let you go ahead and serve the one year, whichever choice you want; that's up to you.

(Emphasis added). The defendant did not respond to the judge's request. The defendant then conferred privately with his counsel in a conference room. When the defendant returned to the court room, he announced that he wanted to appeal. The trial judge again asked if the defendant would make a choice between the sentence alternatives. Defendant's counsel informed the judge that the defendant did not choose either sentence but instead wanted to serve notice of appeal. The trial judge announced that defendant had rejected probation, and sentenced defendant to the one year active term. He then entered notice of appeal on defendant's behalf.

Defendant argues that the trial judge acted vindictively by imposing the active sentence because he gave notice of appeal and had asked for a trial by jury. We see nothing in the record to support defendant's argument. The record discloses merely that the trial judge offered the defendant alternative sentences which included less active time but also included conditions attached to the probationary period. Defendant failed to accept the probationary sentence with its conditions. Based on the record before us we conclude that the defendant has failed to "overcome the presumption that [the] court acted with proper motivation in imposing a more severe sentence." *Id.* Accordingly, this argument is overruled.

## II

[3] Defendant next argues that the trial court erred by denying his motion to suppress all evidence resulting from seizure of Persian Flame. Specifically, defendant argues that department employees allegedly failed to follow the mandates of G.S. § 19A-46, G.S. § 19A-3 and G.S. § 19A-4.

G.S. § 15A-977 requires *inter alia* that all motions to suppress be in writing, be served upon the State and be accompanied by an affidavit containing facts supporting the motion. Here, the trial court specifically denied defendant's motion because it did not comply with the statute's requirements. The trial court ruled:

> THE COURT: All right. Let the record show, first of all, that the motion, not meeting the requirements of Statute 15A 977(a) gives rise to being dismissed summarily by the Court. Therefore the motion to suppress is DENIED.

> However, the Court in an effort to expedite the matter after counsel for the defendant has entered a plea of not guilty, the Court did hear evidence and from the evidence will make additional findings in addition to its previous ruling . . . .

Despite the fact that the court heard evidence and made findings, the Court made it clear that the basis for its decision to deny defendant's motion to suppress was defendant's failure to comply with the requirements of G.S. § 15A-977. This was permissible. *See e.g., State v. Harris*, 71 N.C. App. 141, 321 S.E.2d 480 (1984) (a motion to suppress which is not accompanied by an affidavit is subject to being summarily dismissed.) The record does not disclose precisely which violation of the statute the trial court relied upon,

although it appears that the motion to suppress was oral and appears not to have been accompanied by an affidavit.

## III

[4] Defendant next argues that the trial court erred by not providing him and his counsel with a pre-appeal hearing on the defendant's motion for appropriate relief. The trial court summarily dismissed defendant's motion because defendant failed to attach an affidavit to the motion.

N.C.R. App. P. 9 provides, in pertinent part:

(3) **Composition of the Record in Criminal Actions.** The record on appeal in criminal actions shall contain:

* * *

(i) copies of all other papers filed and statements of all other proceedings had in the trial courts which are necessary for an understanding of all errors assigned, unless they appear in a verbatim transcript of proceedings which is being filed with the record pursuant to Rule 9(c)(2) . . . .

Here, the record on appeal does not include (1) a copy of defendant's motion for appropriate relief or (2) any supporting documents that might have been filed with that motion. Accordingly, we have no basis on which to review the trial court's summary dismissal of the motion. This assignment is overruled.

## IV

[5] By his next assignment defendant claims that the trial court erred by failing to vacate his conviction because there was no showing that he acted willfully. We disagree.

"To be punishable as a violation of G.S. 14-360, the act must first be willful. Willful means more than intentional. It means without just cause, excuse, or justification." *State v. Fowler*, 22 N.C. App. 144, 147, 205 S.E.2d 749, 751 (1974) (citations omitted). "[T]his act does not require the allegation or proof of torture or cruelty, except as involved in unnecessary suffering, knowingly and wilfully permitted." *State v. Porter*, 112 N.C. 887, 888, 16 S.E. 915, 916 (1893).

Here, the record is replete with evidence from which the jury could find that the defendant acted willfully. For example, Ms.

Lambiotte testified that Persian Flame was 300 to 500 pounds underweight and that it would have taken more than six months for the mare to become so emaciated. Mr. Redfearn testified that he asked the defendant to remove his horses from his pasture several times (more than three or four) because there was not any food in the pasture. Each time the defendant said that he would do it right away. However, defendant ignored Mr. Redfearn's requests. This assignment is without merit.

V

[6] Defendant next argues that the trial court erred by allowing in defendant's post-arrest statements after earlier granting the defendant's motion to suppress post-arrest statements. Specifically, defendant argues it was error for the trial court to admit the following: (1) defendant's statement that he had heard if you kick a horse in the hip it will stand up; (2) that defendant agreed that Persian Flame needed to be euthanized; and (3) defendant's statement that his horses had not been seen by a vet. Based on the record before us we conclude these statements were not the result of an impermissible custodial interrogation in violation of his *Miranda* rights. Moreover, assuming, *arguendo*, that it was error for the trial court to admit the statements, any error was harmless given the overwhelming evidence presented against the defendant. This argument is overruled.

VI

[7] Defendant next argues that the trial court committed reversible error by making remarks adverse to the defendant in front of the jury. Defendant contends the trial court erred by telling the jury that he was speaking loudly because he understood that defense counsel was hard of hearing. Defendant also contends that the trial court erred when it told the jury, after the jury returned to the court room during its deliberations, that "we are waiting for Mr. Bell and his client, Mr. Talley. I do not know where they are. We'll wait for them." Defendant's contentions are without merit.

> [T]he test of prejudice resulting from a judge's remarks is whether a juror might reasonably infer that the judge expressed partiality or intimated an opinion as to a witness' credibility or as to any fact to be determined by the jury. The effect on the jury of the remark and not the judge's motive in making it, is determinative. Even if it cannot be

said that a remark or comment is prejudicial in itself, an examination of the record may indicate a general tone or trend of hostility or ridicule which has a cumulative effect of prejudice. If so, a new trial must be allowed.

*State v. Staley,* 292 N.C. 160, 165, 232 S.E.2d 680, 684 (1977) (citations omitted). Here, after careful examination of the record before us, we conclude that the statements made by the trial court were not prejudicial. The record does not reveal a cumulative effect of prejudice resulting from any general tone or trend of hostility or ridicule. This argument is without merit.

VII

[8] By his next argument defendant contends that the trial court erred by failing to allow the jury to see documents requested during its deliberations. The relevant colloquy is quoted below.

In regard to the second question, may we also see the yellow sheet of paper, vet's certification of health for transportation, from the defendant.

Are you referring, Mr. Foreman, and members of the jury, to Defendant's Exhibit 3 which I hold in my hand?

MR. WILLIAMS: Yes, sir.

THE COURT: Let the record show that Defendant's Exhibit 3 was marked, offered into evidence, was received into evidence. Your request to see that is allowed.

The trial court then instructed the bailiff to give the exhibit to the jury, which he did. After the jury had retired to the jury room to continue their deliberations, the following transpired:

MR. BELL: We had another paper that was offered into evidence that was marked Defendant's Exhibit Number 2.

THE COURT: Yes, sir, but they did not request that. They referred to a yellow piece of paper. What you have is not yellow, and the jurors indicated what they requested was Exhibit 3 when I asked them.

Defendant argues that "it appears that the jury also wanted to review Defendant's exhibit No. 2 of the health certificate relative to the transportation of defendant's horse, 'Persian Flame,' into the State of Florida which was admitted into evidence. . . ." The

STATE v. TALLEY

[110 N.C. App. 180 (1993)]

transcript does not support defendant's argument. It is clear that the jury received the document they requested. We hold that the trial court did not abuse its discretion by submitting only Exhibit 3 to the jury. G.S. § 15A-1233.

## VIII

[9] Defendant next argues that the trial court erred by failing to consider as mitigating factors, the defendant's honorable discharge from the South Carolina National Guard, his education, his lack of a prior criminal record, his character, his standing in the community and contributions to the community. We note that the offense charged here is a misdemeanor punishable by a maximum term of one year. Accordingly, it is not within the scope of the Fair Sentencing Act. In addition, there is nothing in the record to indicate that the trial court failed to consider these items as mitigating factors. Accordingly, this argument is overruled.

## IX

[10] Finally, defendant argues that the trial court erred by failing, *sua sponte*, to disqualify himself due to his own bias against the defendant. We have carefully reviewed defendant's arguments under this assignment and find them to be without merit. *See State v. Vega*, 40 N.C. App. 326, 253 S.E.2d 94, *review denied and appeal dismissed*, 297 N.C. 457, 256 S.E.2d 809, *cert. denied*, 444 U.S. 968, 62 L. Ed. 2d 382 (1979). Accordingly, this argument is overruled.

## X

Defendant's remaining assignments have been abandoned pursuant to N.C.R. App. P. 28(b)(5).

No error.

Judges MARTIN and JOHN concur.