Filed 11/15/13  P. v. Lee CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ELLIS LEE,<br><br>    Defendant and Appellant. | H037729<br>(Santa Cruz County<br>Super. Ct. No. F20687) |

In October 2011, a jury convicted defendant Ellis Lee of felony cruelty to an animal (Pen. Code, § 597, subd. (b))[1] and misdemeanor failure to care for an animal (§ 597f, subd. (a)).  These convictions were the result of defendant's placement of a "hair tie"[2] around the muzzle of her puppy, which caused deep lacerations and scarring.  On appeal, defendant argues her defense counsel provided ineffective assistance by failing to object to expert testimony from veterinarians.  She also claims the trial court erred by ordering her to pay $1,000 for appointed counsel's services without providing adequate notice or hearing.  For the reasons stated here, we will affirm the judgment.

---

[1]  Unspecified statutory references are to the Penal Code.

[2]  The device was described variously at trial as a "hair tie," a "hair band," and a "rubber band."  A similar object received from defendant was marked as an exhibit at trial, but the record does not contain a description of its size, shape or material.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

According to testimony at trial, defendant purchased a purebred Husky puppy in September 2010 and named it Syerra.  Defendant bought Syerra to provide her other dog, Striker, with company because defendant spent much of each day working at a restaurant and attending classes full time at U.C. Santa Cruz.  The two dogs initially lived together in the garage of the residence defendant shared with two roommates, but defendant relocated Syerra to a crate when the two dogs did not get along.  The crate dimensions were described as "about two by two by two or three-feet in diameter."  On days when defendant attended classes, Syerra stayed in the crate for up to 11.5 hours.  Defendant testified she did not take Syerra for walks because she did not have time to train her.

Stacey Gee, one of defendant's roommates when she owned Syerra, testified that one day in October 2010, the third roommate discovered Syerra in her crate in the garage with a hair tie around her muzzle.  When the roommate brought Syerra upstairs, Gee noticed the puppy was "cut up . . . [a]round its snout . . . ."  According to Gee, Syerra's crate was covered in feces and Syerra's fur had brown and yellow stains on it.  Gee and the other roommate cleaned the dog and the crate.  The roommates confronted defendant about her treatment of Syerra and provided food and water to the puppy for roughly one week.  They ultimately reported defendant to an animal control officer for the County of Santa Cruz when Syerra's injuries did not improve and defendant appeared unwilling to provide Syerra the help she needed.  Though the length of time the hair tie was attached to Syerra's muzzle was disputed, it was attached for at least a number of hours.[3]

---

[3]  Defendant claimed the hair tie was on for only a matter of hours because she placed it on Syerra before leaving for work and returned home that same day to find that someone had removed it.  Gee testified that she heard defendant tell the animal control officer the hair tie had been on for three days.  The animal control officer, Shauna Urratio, testified defendant told her she had put the hair tie on the dog about a week prior but could not recall when it was taken off.  Based on the extent of Syerra's injuries, the veterinarians who testified during the trial also had differing estimates about the length of

*(Continued)*

Regardless of the duration, defendant admitted placing the hair tie on Syerra to prevent her from making noise and acknowledged that the hair tie prevented Syerra from opening her mouth.

Animal Control Officer Shauna Urratio testified that she went to defendant's residence to inquire about Syerra on October 31, 2010, in response to a call she received a day earlier. Urratio immediately noticed the wound on Syerra's muzzle, describing it as red, inflamed, and infected. She also noted the surrounding fur was matted with pus from the wound. Syerra seemed lethargic, which Urratio stated was atypical behavior for puppies generally and Husky puppies in particular.[4] Urratio explained she was concerned about Syerra's wellbeing given the injury to her muzzle, the small size of the crate, the lack of water inside the crate, and what she perceived as a non-responsive and rude attitude on the part of defendant. As a result of her observations, Urratio gave defendant two options: either take Syerra to a veterinarian and report back to Urratio or surrender the dog to the County. Defendant chose to surrender the dog.

After defendant surrendered Syerra, Dr. Jay Vick examined and treated the dog. Dr. Vick testified that Syerra had a laceration all the way around the circumference of her muzzle through the full thickness of her skin. The injury was consistent with pressure having been applied on the area for a prolonged time. Based on the inflammation, swelling, and infection in the area, Dr. Vick estimated the hair tie had been on Syerra's muzzle between five and 14 days. Apart from the significant injury to her muzzle, however, Dr. Vick testified Syerra seemed healthy, well-hydrated, and well-fleshed.

time the hair tie was attached to Syerra. The initial treating veterinarian, Dr. Jay Vick, who testified on behalf of the People, estimated a range of 5 to 14 days while the defense veterinarian, Dr. David Shuman, stated it could have been there for "a day easily" but disagreed with Dr. Vick's longer estimate.

[4] Urratio conceded at trial that since she had never interacted with Syerra before she did not know if this lethargy was atypical behavior for Syerra.

A family from Walnut Creek adopted Syerra.[5]  The mother of the family, Terry Shaw-Krivosh, testified that although Syerra seemed healthy, the dog had little energy despite being a puppy.  Fearing something was wrong, the new owners took the dog to Dr. Susan Le, who diagnosed Syerra with an adhesion, which Dr. Le explained is an unnatural connection between the mucus membrane of the right lip and the right gum.  Dr. Le performed surgery to prevent the dog's mouth from becoming deformed as a result of the adhesion.  Like Urratio and Shaw-Krivosh, Dr. Le noted Syerra was withdrawn and quiet, which was behavior she found unusual for a Husky puppy.  Dr. Le also observed scarring on Syerra's muzzle.

The jury heard testimony from a number of witnesses, including three veterinarians: Dr. Jay Vick, Dr. Susan Le, and Dr. David Shuman.  During the People's examination of Dr. Vick, the prosecutor asked him what he thought were the bare necessities for the proper treatment and care of a dog.  Dr. Vick responded with a number of "common sense things" that he described by using an "ethical framework" from Europe called the "Five Freedoms:"  (1) freedom from thirst and hunger;  (2) freedom from discomfort;  (3) freedom from pain, injury, and disease;  (4) freedom to express normal animal behavior; and  (5) freedom from fear and distress.

The prosecutor also posed hypothetical questions based on the facts of defendant's case and asked Dr. Vick whether he thought the conduct in the hypothetical situations would be a gross departure from an ordinary pet owner's standard of care.  Dr. Vick responded that he believed each of the three hypothetical situations:  (placing a band around a dog's muzzle; requiring a dog to live in a small crate covered in its own urine and feces; and, placing a band around a muzzle that results in injuries) would be a gross departure.  Defense counsel objected to each hypothetical, arguing they called for a legal

---

[5] The adoptive family renamed the dog Luna but we use Syerra for the sake of consistency.

conclusion. The court overruled the objections but gave the jurors a limiting instruction to the effect that they were responsible for making the ultimate decisions and that all testimony was provided merely to assist them in making their own independent decision.

In addition to Dr. Vick, the People called Dr. Le, who had performed the surgery to remedy Syerra's adhesion. In response to the same hypotheticals posed to Dr. Vick, Dr. Le also opined that each situation would constitute a gross departure from the ordinary standard of care for a dog. The only veterinarian that did not consider the hypothetical situations unlawfully cruel was the defense witness, Dr. Shuman. He stated that, while it was not normal behavior, conduct similar to defendant's was not a sufficiently serious departure from the ordinary standard of care to constitute animal cruelty.

The jury found defendant guilty of felony cruelty to an animal (§ 597, subd. (b)) and misdemeanor failure to care for an animal (§ 597f, subd. (a)). The court suspended imposition of sentence for five years and required defendant to serve 240 days jail, among other conditions of probation. The court then discussed attorney fees.[6]

The court first made findings regarding defendant's ability to pay, noting she had a job and that, while she paid monthly fees for a vehicle and car insurance, "[t]hese are discretionary matters, not necessities." The court then took judicial notice of the public defender's contract with Santa Cruz County and estimated that the public defender's costs for the case, including eight pretrial appearances and a three-day jury trial, were $6,000. Balancing those findings, the court ordered defendant to pay $1,000 in attorney fees within three years. Finally, the court asked, "Ms. Lee, are you willing to accept that as reasonable, please?," to which defendant replied "Yes."

_____

[6] We note that when the public defender was appointed at the beginning of the case, the court informed defendant that "I may assess fees at the end if it turns out that you have an income and I decide that you can contribute towards the assistance of your lawyer." Defendant agreed to representation on that basis.

II.          DISCUSSION

Defendant makes two ineffective assistance of counsel arguments and also challenges the order that she reimburse Santa Cruz County for part of the public defender's fees.

## A.    INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues her trial counsel provided ineffective assistance by failing to object to testimony by the three veterinarians. To prevail, defendant must show both that her trial counsel's performance was deficient and that the deficiency prejudiced defendant. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To prove prejudice, defendant must affirmatively show a reasonable probability that, but for her trial counsel's errors, the result would have been different. (*Id.* at pp. 217-218.) A reasonable probability is one " 'sufficient to undermine confidence in the outcome.' " (*Id.* at p. 218, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 693-694.) Finally, "[i]f a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew* (2011) 52 Cal.4th 126, 150, citing *Strickland, supra,* at p. 697.)

### 1. The Standard of Care for a Pet Owner is not a Matter within the Common Experience of the Jury

Defendant contends her counsel should have objected to questions asked of the three veterinarians on the basis that their testimony was within the common experience of the jury. Evidence Code section 801 allows experts to provide opinions "[r]elated to a subject that is sufficiently beyond the common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).)[7] In essence, defendant

---

[7] We note that none of the witnesses was identified as an expert and neither party ever explicitly qualified them as such. Nonetheless, because both parties treat the veterinarians' testimony as that of experts, we will assume for purposes of this analysis that they were expert witnesses.

argues that the proper standard of care for a dog is a subject thoroughly within common experience, and as such was not a proper subject for expert testimony.

We first turn to the question of prejudice. Had trial counsel made an Evidence Code section 801 "common experience" objection, we are not convinced the trial court would have sustained it. Though there is no California case on point, cases in other jurisdictions have allowed expert testimony on the standard of care for the treatment of animals. (See *State v. Cochran* (Mo.Ct.App. 2012) 365 S.W.3d 628, 636, fn. 6 [although the appellant had waived the issue for failure to raise it timely, "expert testimony as [to] the proper care of animals . . . cannot be assumed to be within the common experience of the lay juror"]; *State v. Fowler* (N.C.Ct.App. 1974) 205 S.E.2d 749, 751 [refusing to allow expert testimony on dog training methods of punishing dogs was error].) Though dogs are an integral part of many people's lives, dog ownership is not so universal that expert testimony on the proper standard of care for a puppy would not assist a jury.

Even assuming the trial court would have sustained the objection, defendant still cannot show prejudice. First, the trial court made clear through a limiting instruction that, while they should listen to the testimony, it was for the jurors to decide whether defendant subjected Syerra to needless suffering through gross negligence. Second, the People provided ample evidence to support defendant's conviction. Defendant focuses on the conflicting evidence regarding how long the hair tie was on Syerra's muzzle. But the extent of Syerra's severe injuries were undisputed by defendant and documented with several pictures entered into evidence, as well as testimony by Gee, Urratio, and the two treating veterinarians. Also undisputed was the scarring that resulted from those injuries.

In addition to physical injuries, the jury heard testimony from animal control officer Urratio, Syerra's adoptive family, and Dr. Le regarding Syerra's lethargy, which they all testified was atypical puppy behavior. From this the jury could have concluded that the hair tie incident caused emotional injury to Syerra. Finally, to the extent there was conflicting evidence, the jury was entitled to weigh the evidence and determine the

credibility of the witnesses.  We do not disturb credibility determinations on appeal. (*People v. Elliott* (2012) 53 Cal.4th 535, 585 [" 'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends' [Citation.]"].)  Based on the extensive evidence of physical and mental injury to Syerra, we see no reasonable probability defendant would have obtained a better result had the trial court not allowed the veterinarians to testify regarding the proper standard of care.

### 2. Dr. Vick's Testimony Regarding the Five Freedoms was Relevant to the Standard of Care

Defendant also contends her trial counsel was ineffective for failing to object on relevance grounds to Dr. Vick's testimony about the ethical framework known as the "Five Freedoms."  Evidence Code section 350 states that only relevant evidence is admissible.  (Evid. Code, § 350.)  Evidence Code section 210 broadly defines "relevant evidence" as "evidence . . . having *any tendency in reason* to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210, italics added.)  Similar to our analysis above, we find no reasonable probability defendant would have obtained a better result had her trial counsel objected to the relevance of the "Five Freedoms" testimony.

We are doubtful the trial court would have sustained a relevance objection.  The testimony at issue came in response to the prosecutor asking Dr. Vick to describe the "bare necessities" for the proper treatment and care of a dog.  Dr. Vick answered by describing the "Five Freedoms" that should be afforded to animals.  Dr. Vick explained he was answering in terms of these freedoms because the term "abuse" lacks clarity and detail.  We find Dr. Vick's discussion of the "Five Freedoms" relevant because the testimony does have some tendency in reason to describe the standard of care for a dog, which is central to the charges here.

Even if the trial court would have sustained a relevance objection, defendant still cannot show prejudice. The jury heard testimony from multiple witnesses and viewed numerous exhibits detailing the extent and nature of Syerra's injuries, both physical and emotional. The jury also heard defendant admit she placed the hair tie on Syerra's muzzle. In light of the evidence presented, we find no reasonable probability defendant would have obtained a more favorable result had the jury not considered the "Five Freedoms" testimony. Because we find defendant was not prejudiced by her trial counsel's failure to pursue the objections discussed here, we need not determine whether her trial counsel's performance was deficient. (*In re Crew, supra,* 52 Cal.4th at p. 150.)

**B.     ATTORNEY FEES (§ 987.8)**

Defendant raises two issues regarding attorney fees. First, she argues she received inadequate notice of a hearing on her responsibility to pay for the services of the public defender. Second, she argues the order requiring her to pay attorney fees was not supported by substantial evidence.

### 1. The Notice and Hearing Were Adequate

Before appointing counsel for indigent defendants, trial courts must give notice "that the court may, after a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost of counsel." (§ 987.8, subd. (f).) The court must also give notice that it will order the defendant to pay all or part of the cost of representation if the court determines the defendant has the present ability to do so. (*Ibid.*) Finally, "[t]he notice shall inform the defendant that the order shall have the same force and effect as a judgment in a civil action and shall be subject to enforcement against the property of the defendant in the same manner as any other money judgment." (*Ibid.*) In addition to the above-mentioned notice provision, section 987.8, subdivision (b) states "upon conclusion of the criminal proceedings . . . the court may, after notice and a

hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof." (§ 987.8, subd. (b).)

Defendant claims she received inadequate notice of her potential responsibility to reimburse the County of Santa Cruz for the services of her trial counsel. When the court first appointed an attorney for defendant, the court stated: "It may not be completely free. It probably will be, except for the registration fee, but I may assess fees at the end if it turns out that you have an income and I decide that you can contribute towards the assistance of your lawyer." While this notice does not perfectly match the language of section 987.8, subdivision (f), a faulty notice does not compel reversal unless defendant can show she was prejudiced. (*People v. Smith* (2000) 81 Cal.App.4th 630, 638.)

In *Smith,* the First Appellate District determined that although the notice the defendant received upon appointment of counsel was technically deficient, the defendant was not prejudiced by the error. (*Smith, supra,* 81 Cal.App.4th at pp. 638-639.) The court reasoned the defendant "was not in the dark regarding the possibility he might have to pay attorney fees" because prior statements of the court were "sufficient to alert [him] that the concept of reimbursement for attorney fees and costs could apply to him." (*Id.* at pp. 637, 638-639.) Additionally, the defendant in *Smith* received not only a hearing on his ability to pay but also a continuance and second hearing so that he could provide further briefing on the issue to the court. (*Id.* at p. 639; see also *Conservatorship of Rand* (1996) 49 Cal.App.4th 835, 840-841 [finding no prejudice despite faulty notice when individual was provided a hearing where he was present and represented by counsel].)

Here, based on the court's statements when the public defender was appointed,[8] defendant was likewise not in the dark about the possibility that she would have to pay for some or all of the costs of representation. Defendant was also present and represented

---

[8] See footnote 6, *ante*, page 6.

by counsel at the sentencing hearing when the trial court discussed attorney fees and her ability to pay. Further, at that hearing the court solicited a response from defendant personally rather than through her attorney regarding the estimate of the costs and the amount the court sought to recover from defendant. Defendant stated she agreed to the terms of payment described by the court. Had defendant desired to contest any of the court's findings regarding her ability to pay or the reasonableness of the fees ordered, she was free to do so at that time. Defendant did not object at that time and has not shown prejudice resulting from the form of the court's notification.

### 2. The Fee Order is Supported by Substantial Evidence

Defendant's final argument is that the trial court's finding of her ability to pay attorney fees was not supported by substantial evidence. We disagree.

A trial court's finding of a defendant's ability to pay must be supported by substantial evidence but need not be express; it may also be implied "through the content and conduct of the hearings." (*People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1398, disapproved on other grounds by *People v. McCullough* (2013) 56 Cal.4th 589, 599.) The trial court expressly found defendant was presently employed and that her monthly obligations included what the court deemed discretionary items in the form of a car loan and car insurance payments. Though the amount of attorney fees imposed -$1,000 -was not trivial, the trial court allowed defendant three years to complete the payment. Finally, defendant was present at the hearing regarding sentencing and attorney fees, had the opportunity to object, and did not do so. We find sufficient evidence in the record to support the trial court's finding and associated order.

### III. DISPOSITION

The judgment is affirmed.

                _____

                Grover, J.

**WE CONCUR:**

_____

Rushing, P.J.

_____

Márquez, J.